May it please the Court. Good morning, Your Honors. Jeff Lyon for Plaintiff Appellant, Dexter Hooker. Your Honors, the Court granted summary judgment against Mr. Hooker on a wrongful termination claim, although in a letter prepared by April Sanders of Parker Hannifin, it states that he's being terminated for absences. This was on August 22, 2008, and he had just taken protective family medical leave for his daughter's glaucoma. He had a history of taking medical leave for his daughter's glaucoma over a couple of years. And she also wrote in the same document, she acknowledges that on August 14th, he had requested time off to take time off work for the glaucoma. And the last absence she criticizes prior to that is February 1st of 2008. So his absences are an expressly stated reason for the termination. They're covered under the California Family Rights Act. And then he's, one of the alleged performance criticisms that triggered the termination is an email written by a supervisor on August 20th, two days before his termination, referring to an alleged performance error going back to May 19th of 2008, three months earlier. Yet the district court essentially resolved the question of fact, deciding that this May 19th error really occurred on August 19th, and essentially ignored direct evidence of discrimination, which was April Sanders' own acknowledgement that the termination was for absences. And she says nothing about this alleged error made, whether it was on May 19th or August 19th, is having anything to do with the termination. Now, the court did, with respect to the FEHA claims, the court did say that there was a failure to exhaust administrative remedies. But on the wrongful termination claim, that's a common law cause of action. It is not a FEHA statutory claim. It does not require any exhaustion of any administrative remedy. And we cited cases in the brief where summary judgment has been denied, where there's an adverse employment action occurring within two months of the exercise of a protected right, such as the person taking time off work for family medical leave. And, in fact, again, April Sanders essentially confirms the reason is these multiple absences, and the vast majority of absences were for medical leave. Counsel, forgive me for interrupting, but what you just said is what's bothering me. You said the vast majority of absences were for family medical leave, and I can't get them to line up. Can you tell me which absences were for family medical leave? I just can't find record support for that. Well, the ones that immediately preceded the termination. So in the exhibits to the summary judgment motion, I think it's around records approximately 375. But he had a doctor's note excusing him from work for August 14th and 15th, 2008. And then, well, in the he listed them in his declaration in opposition to the summary judgment motion. He was essentially not criticized for absences prior to taking days off work. So I guess maybe here's a better way for me to ask my question. I don't want to take up all your time now, so you might want to address it on reply when you come back. But there are a lot of absences that the company cites for which I can't match those absences up with family medical leave. And I don't hear any response from him about those. Yeah, I mean, I think on page 331, he's being terminated for excessive absences. And the most recent absences were a week earlier for his daughter's glaucoma. And April Sanders confirms that in the paragraph preceding the one in which she's terminating him. And the last absence she refers to prior to that is the preceding February. Well, the list I see is the August 14th and 15th were for medical leave. They were approved. The two days before the 11th and 12th were absences with none, no explanation. August 11th and August 12th. Yes. Well, if the termination is substantially motivated by discriminatory intent, it's a question of fact for the jury under the recent California Supreme Court case in Hudson, whether or not the person would have been terminated if the protected leave is excluded from consideration. So if the leave for the medical reasons is a substantial motivating reason, then the jury has to decide whether or not if the unexcused absences would have resulted in the termination, even if the medical leave absences had been excused. And I would submit that supporting the validity of that question of fact in this case is that he didn't really start taking much medical leave for his daughter's glaucoma until 2006. He didn't have write-ups for absences prior to that. And then once he starts taking medical leave, yes, Parker knows that it's not a good idea to write him up for the medical leave for which he takes for which he's off for his daughter. But they write him up a lot more than they had previously. So they expose him to excessive and unfair criticism relative to the way they had treated him prior to the 2006 absences for the daughter's glaucoma. And throughout the exhibit submitted in opposition to the summary judgment, there's all kinds of, you know, time off for the daughter, and then there's all kinds of then there are periodic criticisms of him for his attendance. And then you get to August where his attendance has been pretty good for most of 2008, and they acknowledge in his performance review of approximately I think it was about August 8th, your attendance is getting better, continue to maintain an acceptable level. And then three weeks later he's off for a couple of days for his daughter, and then two days after that he's terminated. So it's a... But you're leaving out the fact that after he's just been told he's got to work on his attendance on whatever that was, August 8th, there's no explanation, he's just not there. Well, I think it's still a question of fact for the jury. They didn't terminate him on the 12th, the 13th, 14th, 15th, 16th, 17th, 18th, 19th, 20th. But then when he takes two days off for his daughter's glaucoma, he's terminated on the 22nd based on a document from the 20th that refers to something that happened in May. It doesn't say you have unexplained absences. The email of the 20th doesn't say you have unexplained absences on the 10th and 11th, therefore you're being terminated. It talks about his attendance generally. And most of the time that he's taking off in general is for the daughter's glaucoma and for his injuries from the car accident. So when they terminate him, it's just up to the jury whether it's substantially motivated by the medical leave or would they have terminated him anyway for the non-medical absences if he didn't have any medical absences. That's a question of fact for the jury. I have a slightly different question. Are there any disputes where the employer's records show he was absent and he says he was there? Not that I'm aware of. Okay, thank you. As to the FEHA claim and the equitable tolling doctrine, in the Rodriguez case, the court found that where the employer's records show he was absent, the employee had gone into the FEH, complained about discrimination, signed a declaration saying that I told the representative of the different types of disability and the other claim, the race claim, I think it was, that I had. They did not include that in the complaint. And then that was held to be a question of fact for which the case was remanded to the judge. And I'm not going to go into the district court for further proceedings on that. So in this case, Mr. Hooker, who was in pro per, went to DFEH within the one year, told the representative one of the reasons he thought he was terminated was for exercising his right to medical leave. That's reported by April Sanders' own letter that that was the major reason for his termination. And then DFEH waited seven months within which to issue his complaint. And as an in pro person, seven months after the fact, being asked to sign off on the complaint, he signed it. Within eight weeks, he hired an attorney. Within about four weeks after that, a new DFEH complaint was filed referencing the disability discrimination claim. And under Rodriguez, the Sanchez case we cited, the California case of Sandu, which adopted the Sanchez reasoning, where the claimant is in pro per and signs a declaration saying, I told the DFEH representative about the claim. That's sufficient to raise the question of fact. And given the explicit reasons given for his termination, that would make sense that he would raise that as an issue with DFEH. No, it was an oral interview with DFEH. But in the Rodriguez case, the investigator actually had notes of the oral interview with Rodriguez. Apparently there was no questionnaire in that case either. The investigator's notes actually contradicted what Rodriguez was saying. They actually indicated he didn't complain. I'm familiar with that case. But in your case, is there anything to indicate that your client made that oral representation? No, just his declaration and the factual circumstances. But I think it's an a fortiori case because in Rodriguez, it actually contradicted the written record. Thank you. Counsel, I have three questions. Maybe I should just knock them out right at the top, and then I'll try to stay out of your way. On page 15 and 16 of your brief, you said that Hooker admitted to several infractions. I can see a lot of places where he says he didn't remember, but where did he admit to several infractions? In your reference, Your Honor, on page 15 of the brief, we've made a number of notations of infractions that were unexplained and challenged. Yep. Okay. So with respect to the location in the briefs, it's undisputed, Your Honor, that we place the citations as it relates to the chart. From March 17, 2008, May 16, 2008, and the various other tardiness and absences that are set forth here, we have the citations here where there's his admissions under. So if I don't see them there, then that's what you've got? That's correct, Your Honor. All right. Then on page, please, 12, you said that he received an infraction on May 30th. I don't see evidence in the record to support that either. On May 30th of? Sorry, 2006. 2006. I should say it's 2006 is what I wrote down. Read brief at 12. Page 12 on May 26th? May 30th. Sorry. There's a fairly large addendum in item number 8, Your Honor, that I could probably flip through and get back to you perhaps in further detail. All right. While you're flipping, I only have one other question, and that is that you represent several times that he had six-and-a-half infractions in 2007, but I was never able to see them in the record, I counted for just that total. So I'd be interested to know which specific dates you're referring to. That's fine, Your Honor. But just real briefly, and to respond to the appellant's point of view, first of all, my name is Vince Verde. I represent Parker Hanifin. And may it please the Court, I'd like to address some of those points that they've asserted. First of all, one of the main issues in this particular matter is the ---- Why don't you just answer the question? The main issue that we have before the Court, Your Honor, is really what happened in 2008. So you want to just ---- So we'll just forget 2006 and 2000? 2006 and 2007 show a pattern of absence. Well, then you're saying it is relevant, and Judge Christin asked you a question about it. And what you're supposed to do is answer the question you're asking. With respect to May 20th, to May 20th, the 2007 date, Your Honor, for that infraction, I will try to track down the actual date, but the record is fairly voluminous and I could get to that. Did you have a third question? I asked it. I don't know which specific dates are the six and a half that are supposed to have happened in 2007. And I think maybe this answers it. Yeah, I think so too. That's fine. And in 2007, Your Honor, that we've made references to are the ---- He arrived late for work on August 17 and August 21, and under our policies, those are half points. Okay, August 17 and August 21. That's correct. Anything else? He had an unexcused absence on May 12 and August 11 and August 18. And those are three points. So you get three points for being absent. And how many points do you get for being late? Half a point, Your Honor. Half a point. And that's how you get to six and a half days for 2007? Since May of 2007. I didn't say since May. Just to be clear, I'm talking about your brief says he had two ---- sorry, six and a half infractions in 2007. And I'm just trying to get ---- figure out where they are.  All right. I think there's a confluence of the infractions in the annual review that's indicated in August 6 of 2007, where they were going back where there was a 5.5, 5.5 infractions, and then going forward from that date and up to August 22, 2007. Just within that timeframe of May 2007 and into August 22 of 2007, there was a total of 6.5. However, because of the policy itself, taking into account only six months, it wasn't relevant with respect to the short timeframe of the review, but the combination in between the reviews, you had the number of 6.5. I think that's where the counting was. But with respect to the actual review, it was four. And so that's where the math comes in, Your Honor, with 6.5. Thank you. Now, addressing some of the points that my appellant has raised, the administrative ---- exhaustion of administrative remedies in this matter is clear that this matter is jurisdictional. With respect to the first charge, the first charge only asserted the claims being age, race, or color. No allegation as it relates to any of the disability charges. The second charge, which was implemented or filed in April of 2010, that's the first time we learn of any of the allegations as it relates to disability. And after that, because the disability box was checked off, there's further additional facts within the attachments to the charge that would indicate what type of disability, and that's in the box reflecting the limbs, having disability related to the limbs was checked, but not disability as it relates to the urinary tract, which Mr. Hooker eventually complains of, which relates to the kidney removal. What the Rodriguez tells us is that the race claim or the race charge and the disability charge are two distinct disability charges. In fact, Rodriguez uses the words totally different from one another. Rodriguez also goes into the analysis of taking a look at what the factual allegations are within the charges to ascertain whether the weight of the charge itself goes into and allows for an expansion of the expansion for additional charges, which in this case what an appellant would like would be the disability charge. But I submit, Your Honors, that if you take a look at the charges themselves, there's absolutely no facts that would suggest that the weight of the charge would include the disability charges that the appellant in this particular case would like this Court to relate back. Indeed, if you take a look at the first charge, solely limited to race, age, which they concede was the initial claim, and you take a look at the second charge in April and you marry that up with the actual complaint, the only allegations alleged at all are the disability related claims. So this is not a scenario where you would have the race and age claims being brought in the same complaint along with the disability charges. In essence, what you have here is the recognizement that they're giving up on the first charge and just marrying it up to what they've asserted in the April 2010 charge, which we assert and which they do not really challenge, is the weight charges or weight claims, weight disability claims. Now, they make some mention about what Rodriguez has as it relates to equitable tolling. But in reality, what Rodriguez does, he points to Denny. Rodriguez points to Denny and talks about when equitable tolling applies. And equitable tolling applies when there's an actual misstatement made by the DFEH and they were misled. And there was a challenge that was made by the plaintiffs. It didn't matter whether the pro pera had counsel, but really the main focus there was whether or not there was a challenge, they were misled, and there was reliance. Here, there is no evidence of a challenge, no evidence of being misled, and there was no evidence of reliance. So we submit, Your Honor, Your Honors, that equitable tolling does not apply. And as a result, any of the causes of action as it relates to the exhaustion of administrative remedies claims, every cause of action with the exception of four and seven should be dismissed for failing to exhaust their administrative remedies. Furthermore, the appellant also asserts the claim that the FEHA claim as it relates to the wrongful termination and violation of public policy is not subject to the administrative remedies claim. There's a separate rationale why that claim should also be dismissed and that the lower court's decision be affirmed, and that is that they have failed to come forward with substantial evidence showing that there was pretext. The language used by the district court was pretty strong, that they have to show that this type of evidence is unworthy of belief or credence, the explanation provided by the employer. They're essentially mixing, Your Honor, apples and oranges in terms of theories, because focusing on the temporal proximity that they have asserted is really more of a claim for prima facie case. And the court has indicated, assuming that there was a prima facie evidence, that the employer in this case has set forth a legitimate nondiscriminatory reason. And I submit, Your Honors, but by taking a look at our brief, page 47 of our brief, it'll set forth the four and a half points that they have earned within a six-month period, which they do not dispute. What's a six-month period? The six-month period, and I'll be more accurate on this, the six-month period on page 47, starting from March 17, 2008, the absences being March 17, 2008, May 16, 2008, July 22, 2008, July 29, 2008, August 11, 2008, and August 12, 2008. Okay, so during that period, Counsel, there's one, two, three absences. That's correct, Your Honor. And there's two entries for late. I don't know how late you have to be to be late, and one for left early. That's correct, Your Honor. And those absences were a complete absence where you don't show up as a whole point. A tardy or leaving early without permission would be half points, and that's how we got the four and a half points. How tardy do you have to be to be tardy? It's within the timeframe you're supposed to go in, in its normal time. I believe it's a – I don't have that information on the record, Your Honor. So you don't know if it's two minutes, five minutes, 30 seconds? That's correct, Your Honor. That wasn't an issue before the court. You're not relying on those late appearances or early departures? No, we are, Your Honor. We're relying on those as it relates to the May 17th, which there was an absence. The May 16, 2008, where he was late. July 22, 2008, where there was an absence. There was an early departure on July 29, 2008. And August 11, the person was tardy. And on August 12, 2008, they were absent. So Post and Counsel's argument is going to be, look, he only missed three days in 2008 before you fired him, and that these late or tardy – we don't have any record to know if that's one minute, if the employer was being unreasonable. What's your response to that? The question of unreasonableness was never raised before the lower court, Your Honor. But there was an acceptance on the record. And, in fact, Mr. Hooker had indicated that he had no explanations for these tardies on the record. We provided the citations on the record. We can refer the court to what his explanations were, and even Mr. Hooker doesn't have any explanations for why he was tardy. Counsel, forgive me for coming back to this, but in 2006, I asked you about – your brief said that he admitted these absences, these infractions. And what I see in 2006 is admitted in the deposition. When I look at the deposition in this chart, what I see is that he says a lot that he doesn't know. Is that what you mean by admitted? He can't explain? That's part of it, Your Honor, if there's an inability to explain it. You treat that as an admitted? An admission of not being able to be there. I see. There are some other areas, Your Honor, that are more clear cut in what his statements are, including the fact that he's admitting that these are infractions. And that's what we've also referred to on our record. So the question wouldn't be why he was not present, because it sounds from opposing counsel like there's no dispute where he's saying I was there and you recorded that I was gone. But the question would be why. And he can't explain. That's your point. That's correct, Your Honor, because what he's also admitted in the past, and we've got citations to this, is that he has never been denied an FMLA leave. He has never been denied an opportunity to see his daughter. And so when there has been a medical treatment. So if you put that admission that he has never been denied seeing doctors, never been denied an FMLA leave, and those are the documents that are pretty set forth here in the document, I think you can get a more fuller picture of that, Your Honor. If there's no other questions, I'll move on. Thank you. Thank you. In 2006, they wrote him up on June 16th after he'd taken about ten days of medical leave, and they wrote him up for prior absences, of which he had four as of June 16th, 2006. Then apparently in 2007 he's only got three, and then in 2008 he's only got three. So he wasn't terminated for four in 2006, but coincidentally he's written up for them the day he comes back from taking protected medical leave. Then he gets another three in 2007. He's not terminated. Then in 2008 he takes three, but it's after he takes the two for his daughter that he's immediately terminated two days later. And in April Parker's own writing, I think it's record 331, they say she explicitly talks about the absence for his daughter, not for any other absence in 2008. Just the one for his daughter a couple of days earlier says your absences are excessive, and then he's terminated two days later. I think the record raises a question of fact that they're frustrated with his absences, and their frustration includes medical leave absences, and they write him up when he comes back for medical leave, but they write him up over the other absences, but it's the day he comes back or a couple of days later after his medical leave that they write him up. Then the same thing happens again in 2008. He only has about three absences. Then he's out a couple of days for his daughter for the glaucoma again, a condition that they know is ongoing. He'll probably need to take it again. And when they say he was never denied medical leave, you need two things for medical leave. You need a job, and you need medical leave from the job. So if they take away the job, that's, in effect, a denial of medical leave. So I think there's clear evidence of a question of fact from Parker's own writings that they were frustrated with the medical leave, and that it's up to the jury to decide whether he was substantially motivated by medical leave, and if you took away the medical leave, would they have terminated him anyway without having taken medical leave? And that's a question of fact. Thank you, Judge. Thank you, Your Honor. The case is dragged and will be submitted. The Court will stand in recess for the day.
judges: Sedwick, Reinhardt, Christen